2006 VT 11

**In re Appeal of CLYDE RIVER HYDROELECTRIC PROJECT**

[895 A.2d 736]

No. 04-101

¶ 1. January 17, 2006. This appeal arises from the issuance of a water quality certification by the Vermont Water Resources Board for operation of the Clyde River Hydroelectric Project in northern Vermont. The Vermont Natural Resources Council and the Northeast Kingdom Chapter of Trout Unlimited (appellants) contend the Board's decision: (1) violates provisions of the Vermont Water Quality Standards; (2) is unsupported by the evidence; and (3) contravenes the Public Trust Doctrine and the Common Benefits Clause of the Vermont Constitution. We affirm.

¶ 2. In support of its request to the Federal Energy Regulatory Commission (FERC) for relicensure of the Clyde River Hydroelectric Project, applicant Citizens Communications Company submitted a water quality certification application to the Agency of Natural Resources. See 10 V.S.A. § 1004 (designat-

ing the Agency of Natural Resources as the state's certifying agency for purposes of § 401 of the Federal Clean Water Act). The Agency granted the certification, which was then appealed to the Board for de novo review. The Board received extensive prefiled testimony, conducted a site visit, and held an evidentiary hearing over several days in April 2003. In July 2003, the Board issued a written decision, granting the certification with certain added conditions. In response to appellants' subsequent motion to alter, the Board amended its decision but otherwise denied the motion. This appeal followed.

I.

¶ 3. To better understand and evaluate the underlying facts and claims on appeal, a brief preliminary review of the regulatory backdrop is useful. Vermont's Water Quality Standards (hereafter "Standards") were enacted under the authority of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1387, commonly known as the Clean Water Act (Act), to implement the Act's principal goal of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters," *id.* § 1251(a), including the attainment of "water quality which provides for the protection and propagation of fish, shellfish, and wildlife." *Id.* § 1251(a)(2). The Act permits each state, subject to federal approval, to adopt comprehensive water quality standards establishing designated uses and water quality criteria for all navigable intrastate waters. *Id.* §§ 1311(b)(1)(C), 1313(c)(2)(A); *PUD No. 1 of Jefferson County v. Wash. Dep't of Ecology*, 511 U.S. 700, 704 (1994); *In re Town of Sherburne*, 154 Vt. 596, 601, 581 A.2d 274, 277 (1990). Under § 401 of the Act, an applicant for a federal permit to conduct activities that may result in a discharge into state waters must present to the federal agency (in this case the FERC) a certifi-

cation from the state "that any such discharge will comply with the applicable provisions of" the state's water quality standards. 33 U.S.C. § 1341(a). Thus, Citizens, as an applicant for relicensure of its hydroelectric facility on the Clyde River, was required to obtain a § 401 certificate from the state.[1]

¶ 4. Consistent with its mandate under the Act, the State of Vermont has adopted comprehensive water quality standards under which all waters above 2500 feet and all waters used for public drinking water are Class A waters, 10 V.S.A. § 1253(a), and all other waters are Class B unless otherwise reclassified by the Board. *Id.* § 1253(b). The Clyde River has been designated as Class B under the Standards. Vermont Water Quality Standards § 4-17(B). Designated uses for Class B waters include "aquatic biota and wildlife sustained by high quality aquatic habitat," *id.* § 3-04(A)(1), water character, flows, level, and bed and channel characteristics "exhibiting good aesthetic value," *id.* § 3-04(A)(2), and "[b]oating, fishing, and other recreational uses." *Id.* § 3-04(A)(6). Criteria that must be met for such uses include the following: "No change from the reference condition that would prevent the full support of aquatic biota, wildlife, or aquatic habitat uses. Biological integrity is maintained and all expected functional groups are present in

a high quality habitat. All life-cycle functions, including overwintering and reproductive requirements are maintained and protected." *Id.* § 3-04(B)(4). In addition, the Standards require "no change from reference conditions that would have an undue adverse effect on the composition of the aquatic biota, the physical or chemical nature of the substrate or the species composition or propagation of fishes." *Id.* § 3-04(B)(4)(d).

II.

¶ 5. With this regulatory framework in mind, we turn to consideration of the certification on appeal. Applicant's project consists of an existing hydroelectric facility located on the Clyde River, a river that meanders for some thirty miles in a northwesterly direction through northern Vermont to empty into Lake Memphremagog in the City of Newport. The Clyde has been harnessed for waterpower since the early nineteenth century, and contains numerous historic mill sites and dams. The hydroelectric facility at issue in this case was originally licensed in 1963, and consists of four separate dams, although the instant appeal is solely concerned with the dam known as Newport 1,2,3 in the Town of Derby and the related powerhouse located downstream in the City of Newport. The Newport 1,2,3 dam was originally constructed in 1918, but has since been modified and repaired on several occasions, most recently in 1990.

¶ 6. The Newport 1,2,3 facility bypasses approximately 1800 feet of the river in order to channel water from the dam to the powerhouse, at which point the water is discharged back into the river at the tailrace. A key issue during the certification process before the Agency and Board concerned the minimum stream flow necessary to comply with water quality standards by restoring and maintaining fish habitat in the bypass reach. Studies had indicated that

---

[1] In *PUD No. 1*, the United States Supreme Court rejected a challenge to a state's authority under the Clean Water Act to impose minimum stream flow requirements within segments of a river to be used for a proposed hydroelectric facility, and further noted that there was no dispute that the discharge of water from a hydroelectric powerhouse into a river after it has been used to generate electricity is a "discharge" within the meaning of the Act. 511 U.S. at 711-15.

salmon, which had been periodically stocked in the Clyde River since the 1860's, and other cold water fish had historically returned from colder and deeper waters in Quebec to spawn in the Clyde and other Vermont streams and rivers. At the time of the relicensure application, however, the number of fish returning to spawn in the Clyde had decreased dramatically.[2]

¶ 7. Since the project's inception, the bypass had been largely dry, generally receiving very small amounts of water from leakage over the dam for a measured flow of about 2.0 cubic feet per second (cfs). To restore fish habitat in the bypass, applicant proposed to maintain a minimal flow of 5 cfs in the bypass channel. However, based on stream flow studies of the Newport 1,2,3 bypass and the Agency's general guidelines for minimum stream flows at hydroelectric projects, the Agency concluded that applicant's proposal for 5 cfs would not provide adequate habitat for cold water fish. Instead, the Agency determined that a minimum flow of 30 cfs was necessary and sufficient to support aquatic habitat and comply with water quality standards. The Agency also approved applicant's proposal to construct a pipeline and trap-and-truck operation to facilitate the passage of fish upstream and downstream of the Newport 1,2,3 facility, where potential spawning and nursery habitat was much greater than within the bypass reach itself.

¶ 8. On appeal, the Board concurred in the Agency's finding that 30 cfs would meet water quality standards, finding that it represented a significant improvement over existing and past conditions in the bypass channel. The Board acknowledged, however, that the provision of 30 cfs would not support *all* life stages of salmonid (i.e., trout and salmon) in the bypass; specifically it would not support spawning and incubation habitat. Nevertheless, the Board found that this deficiency did not violate the Standards because it did not represent a change from the River's "reference condition," defined in § 101(B)(39) of the Standards as "the range of chemical, physical, and biological characteristics of waters minimally affected by human influences." To determine the range of chemical, physical, and biological characteristics that one might expect in a river like the Clyde in its natural state, the Board looked at studies of three northern Vermont rivers sharing characteristics similar to the Clyde, as well as those physical features of the Clyde itself that might have had an impact on its historical use for aquatic habitat, particularly the potential obstruction to migrating salmonids posed by a steep bedrock cascade within the bypass reach known as Arnolds Falls.

¶ 9. Based on this evidence, the Board was not persuaded that salmonids ever had, or ever could, utilize significant portions of the bypass for spawning purposes even with significantly increased stream flow. Furthermore, based on hydrological studies, the Board found that segments of the river both upstream and downstream from the bypass provided more extensive and superior spawning habitat, and that applicant's proposal to facilitate passage of fish from the bypass to these areas through a pipeline and a trap-and-truck operation would provide the best means of achieving a self-sustaining population of migra-

[2] Although the parties disputed whether salmon were originally stocked or were indigenous to the Clyde, the Board assumed that they were entitled to protection under the Standards and the Act regardless of origin, and we discern no basis to disturb that assumption.

tory salmonids in the river.[3] These conditions were sufficient, the Board concluded, to maintain high quality aquatic habitat consistent with the range of biological characteristics that would be expected of the Clyde in its natural state. Accordingly, the Board concluded that the certificate issued by the Agency, as amended, complied with the Standards.[4]

### III.

¶ 10. Appellants' principal claim on appeal is that the Board's approval of the 30 cfs flow for the 1800-foot bypass reach between the Newport Dam and the hydroelectric powerhouse violates the Standards by failing to provide a high quality habitat for fish and other aquatic life. In addressing this claim, it is important to bear in mind the limited nature of this Court's review of the certification process. We assess the Board's decision solely to determine whether it acted arbitrarily, unreasonably, or contrary to law. *Town of Groton v. Agency of Natural Res.*, 172 Vt. 578, 579, 772 A.2d 1103, 1105 (2001) (mem.); *In re Town of Sherburne*, 154 Vt. at 604, 581 A.2d at 278. As we have explained, this requires us to

---

[3] Based on analyses of the Clyde, the Board found in this regard that "the Newport 1,2,3 bypass may contain some usable habitat for salmonid spawning and nursery, but it is fragmented and isolated. At best, there are only 58 habitat units in the bypass reach, as compared with 231 habitat units immediately below the Newport 1,2,3 powerhouse, and another 1,345 units above the Newport Dam."

[4] The Board added conditions to the certificate requiring that the Agency provide public notice and an opportunity to comment on studies assessing the effectiveness of the plan to transport migrating fish upstream safely and efficiently.

determine whether "the decision makes sense to a reasonable person," the factual findings are supported by substantial evidence, and the ruling is consistent with governing statutes and prior Board policy. *In re Town of Sherburne*, 154 Vt. at 605, 581 A.2d at 279. Where the Board's findings are supported they may not be disturbed, even if the record contains conflicting evidence. *Id.* at 606-07, 581 A.2d at 279-80. Furthermore, we accord substantial deference to the Board's expertise in the area of water quality control, and to the Board's construction of its own regulations and enabling legislation. See *id.* at 607, 581 A.2d at 280 (reviewing court will more readily defer to administrative body deciding technical matters); *In re Killington, Ltd.*, 159 Vt. 206, 210, 616 A.2d 241, 244 (1992) (absent compelling indication of error, we will sustain agency's interpretation of its own rules and enabling legislation).

¶ 11. Assessed in light of these standards, the Board's decision readily withstands review. Appellants assert that the provision of a 30 cfs flow in the bypass reach is tantamount to a habitat "write-off" or "sacrifice zone," and there was some evidence to support the claim. The Board expressly considered and rejected the argument, however, finding that a 30 cfs flow was adequate to support fish and other aquatic biota in the bypass, and there is substantial record evidence to support the Board's finding. For example, Mary Nealon, an expert aquatic biologist, testified specifically that the 30 cfs flow was "not a habitat write-off," but rather would support trout, nonrecreational fish, and a variety of macroinvertebrates, including flies considered to be sensitive to inadequate oxygen levels and pollution, such as may flies, stone flies, and cattis flies. As the Board's finding was well within its area of expertise, and was adequately supported in the record, it must be upheld.

¶ 12. Appellants also contend the Board erred in approving applicant's trap-and-truck proposal to allow fish to spawn in areas upstream of the bypass. They assert that the Board should have adopted their alternative proposal to increase flows into the bypass, encourage fish to spawn there, and determine whether — over time — fish could successfully ascend Arnolds Falls and a proposed fish ladder over the dam to reach spawning areas in the upper reaches of the river. Again, however, the Board expressly considered both proposals and found that the trap-and-truck operation was preferable, citing evidence that the bypass provided relatively little viable spawning habitat, that the ascent of Arnolds Falls would pose a substantial risk of death or injury to migrating fish, and that the trap-and-truck operation could be accomplished with relatively less risk. The Board's findings are supported by substantial evidence, and therefore must be upheld. *Id.*

¶ 13. Appellants also claim that the Board violated the Standards by applying different criteria to the bypass reach from the rest of the river. The claim is unpersuasive for two reasons. First, as the Board noted, the Standards contain a specific "Hydrology Policy" for existing dams, which states that the rules are intended to provide a "a means for determining conditions which preserve, *to the extent practicable*, the natural flow regime of waters." Vermont Water Quality Standards § 1-02(E)(1) (emphasis added). To this end, the Standards provide hydrology criteria authorizing the Agency to adopt standards and constraints relating to streamflow protection, and the Board found that the 30 cfs flow for the bypass was consistent with the Agency's Streamflow Procedure for hydroelectric bypasses and the Standards.

¶ 14. Second, as the Board also noted, the Standards require the maintenance of high quality aquatic habitat to the level of the "reference condition," defined as "the range of chemical, physical, and biological characteristics of waters minimally affected by human influences." *Id.* § 1-101B(b)(39). Based on comparative and historical hydrologic studies of the Clyde and other comparable rivers, the Board found that this requirement necessitated the restoration of habitat conditions to support *all* life cycle functions of migrating salmonid, including spawning and growth. It also found, as noted, that this could best be accomplished by facilitating access to large areas amenable to salmonid spawning upstream and downstream from the bypass reach.

¶ 15. The Board's decision demonstrates that it applied a uniform standard to the Clyde River to achieve the goal of restoring and maintaining a high quality aquatic habitat to the level of the *range* of characteristics one would expect to see in a river of this kind in its natural state. It accomplished this goal by identifying areas of the river suitable for the full range of salmonid life-cycle functions, including spawning and growth, and approving methods designed to support these functions. We find nothing in the Standards, the statutory scheme, or the evidence requiring that the Board impose a stream flow sufficient to support a full life-cycle salmonid fishery in every part of the river, including the bypass reach, where the Board found, and the evidence disclosed, that it was questionable whether the bypass had ever accommodated such a fishery, where the evidence supported a finding that the 30 cfs flow is consistent with Agency procedures and will support high quality aquatic habitat, including migratory salmonids, and where other areas of the river will provide high quality spawning and nursery habitat. In short, the means that the Board chose to accomplish the objective of restoring a high quality aquatic habitat to the Clyde River — the particular con-

figuration of minimal stream flows within, above, and below the bypass reach and the choice of specific migratory aids — was well within the Board's discretion and expertise. Accordingly, we discern no basis to disturb its decision.

¶ 16. Appellants' remaining claims concerning the Public Trust Doctrine and the Common Benefits Clause are predicated largely on their argument that the Board's decision violates provisions of the Water Quality Standards. As we have rejected this argument, the predicate claims must also fail.

*Affirmed.*