2006 VT 50

## In re UNIFIED BUDDHIST CHURCH, INC.

[904 A.2d 1139]

No. 05-205

¶ 1. June 9, 2006. The Lull's Brook Watershed Association, Inc., Sterling and Marion Monk, and Peter Gordon,* collectively appellants, appeal from an order of the Water Resources Board affirming the issuance of an amended indirect discharge permit for a new sewage treatment system to applicant Unified Buddhist Church, Inc. ("UBC") by the

---

* According to the notice of appeal to the Water Resources Board, the Monks and Peter Gordon own land abutting that of the United Buddhist Church, Inc., and along Lull's Brook downstream from the development in issue in this appeal. The Lull's Brook Watershed Association, Inc. is a nonprofit corporation, whose purpose "is to work towards protecting, improving, and maintaining the health of Lull's Brook watershed."

Agency of Natural Resources. Appellants argue that the Board erred in dismissing their appeal because a genuine issue of material fact remains as to whether UBC's amended permit application raises water quality impact issues that the Board should have addressed. We hold that the Board properly granted summary judgment and affirm.

¶ 2. An indirect discharge is "any discharge to groundwater." 10 V.S.A. § 1251(15). An indirect discharge of more than 6,500 gallons per day requires a permit from ANR. See id. §§ 1259(e), 1263(a). This case involves three ANR indirect discharge permits, an original permit and two amendments. Only the second amendment was appealed to the Board. All the permits relate to a UBC project to build a monastery and meditation center, together called the Dharma Center, on its property in Hartland, Vermont. The permits authorize UBC "to indirectly discharge treated domestic sewage from a wastewater system serving the Dharma Center to the ground water and indirectly into Lull's Brook."

¶ 3. The basic permit for the waste disposal system, Indirect Discharge Permit No. ID-9-0271, was issued on July 31, 2001. The system was designed to treat "domestic sewage" and was equipped to handle a disposal capacity of 15,000 gallons per day. The system was described as "consisting of septic tankage, a recirculating textile coupon filter pretreatment system, pump station and a leachfield disposal area." It was designed in accordance with the Treatment Index Method, a method specifically authorized by the ANR Indirect Discharge Rules § 14-903(a)(1), 7 Code of Vermont Rules 12 033 003-52 (July 2003). The Treatment Index Method "is a presumptive method of demonstration that a proposed subsurface disposal system that complies with the required treatment index is presumed to comply with the Aquatic Permitting Criteria and the Vermont Water

Quality Standards." Id. The permit stated that "[c]ompliance with the Aquatic Permitting Criteria was demonstrated by using the Treatment Index Method."

¶ 4. The system was designed by an approved engineer, and the permit required that it be constructed as designed. The permit did not regulate the Dharma Center facilities that generated the waste, but the record indicates that UBC intended to use flush toilets in its buildings. The permit did, however, require UBC to obtain a "Water Supply and Wastewater Disposal Permit ... for all buildings." See 10 V.S.A. §§ 1971-1980 (providing applicability and requirements of Potable Water Supply and Wastewater Disposal Permit).

¶ 5. The indirect discharge permit required the system to be operated

> in a manner that will (1) not permit the discharge of sewage onto the surface of the ground; (2) not result in the surfacing of sewage; (3) not result in the direct discharge of sewage into the waters of the State; (4) not result in a violation of the Water Quality Standards; and (5) not result in a significant alteration of the aquatic biota (SAAB).

The permit also required UBC to employ a certified wastewater facility operator and to regularly sample the waterflow at various points in the system and in Lull's Brook for numerous characteristics and chemicals. These data must be regularly submitted to ANR.

¶ 6. The basic permit was not appealed, and the facilities that were to use the wastewater disposal system were not constructed. UBC subsequently filed an application to amend the basic permit to reduce the total allowed waste flow from 15,000 to 9,500 gallons per day and to make other modifications to the waste disposal system because of the lesser

flow. Apparently in order to reduce the quantity of waste sufficiently, UBC planned to use composting toilets in place of flush toilets. The record indicates that the wastewater volume can be reduced by forty percent if the toilets are composting.

¶ 7. The Agency issued the amended permit, Indirect Discharge Permit No. ID-9-0271-1, on May 20, 2003. The amended permit differs from the basic permit only in the disposal quantity and the description of the system, which was changed to "sewage treatment system consisting of septic tankage, pump stations and a leachfield disposal area." Again, the permit was not appealed, and again the facilities linked to the permit were not constructed.

¶ 8. On August 17, 2004, UBC filed an application to amend the amended permit. On December 2, 2004, ANR issued the second amended permit, Indirect Discharge Permit No. ID-9-0271-2. The second amended permit states that it is a "permit amendment," that ANR approved a change to the location and an increase in size of the Main House septic tank, and that "[n]o other substantive changes have been made to the permit." It also references the history in part, stating that compliance with Aquatic Permitting Criteria had been demonstrated in the earlier permit review by using the Treatment Index Method, but that there had been a review of engineering plans for this amendment under the technical design standards of the indirect discharge rules. In all other relevant respects, the second amended permit is identical to the first amended permit.

¶ 9. Although the second amended permit authorized a waste volume of 9,500 gallons per day, the same volume as the first amended permit, UBC intended to stay under the volume level by eliminating some camp sites and thereby lowering the guest capacity of the center,

rather than using composting toilets. This change is at the heart of the appeal to the Board and this Court. ANR consistently took the position that the use of flush, rather than composting, toilets was irrelevant to its review of the second permit amendment. Appellants asserted that the change in type of toilet was significant because a wastewater system servicing composting toilets would treat only "gray water," commonly defined as wastewater from sinks, showers, laundry, etc., whereas a system servicing flush toilets would treat both gray water and "black water," commonly defined as wastewater containing human waste. As a result, appellants argue that UBC's toilet conversion will have a negative impact on the pollution flowing into the groundwater, and eventually into Lull's Brook, and that ANR was required to evaluate this impact in deciding whether to issue the permit.

¶ 10. Appellants appealed the issuance of the second amended permit to the Board. They claimed that the change from composting toilets to flush toilets required ANR to do a new complete review of UBC's proposal to ensure that the proposed system will comply with the Vermont Water Quality Standards. They sought denial of the amended permit application or a remand to ANR for proper review. ANR moved to limit the scope of appeal, and UBC moved for partial summary judgment pursuant to Water Resources Board Rule of Procedure 36. Both ANR and UBC asserted that since the only change to the system from the first amended permit to the second was the change in size and location of one of the septic tanks, the scope of the appeal should be limited to that change, and that appellants could not challenge the permit based on components that were approved, and not appealed, in the issuance of the earlier permits.

¶ 11. The Board granted both motions. The Board concluded that "design capacity and other design features of the septic system," which were approved in the earlier permits and unchanged in the appealed permit, were not reviewable anew. It further concluded that the make-up of the effluent as it entered the sewage disposal system was not material to the amended permit since the permits allowed discharge of "sewage" and did not differentiate between gray and black water. Because appellants had already expressed in a prehearing conference that they would have no interest in pursuing an appeal limited to consideration of the septic tank modifications, the Board dismissed the appeal. Appellants here appeal the Board's grant of the motion to limit the scope of appeal and the motion for partial summary judgment.

¶ 12. A motion for summary judgment pursuant to Water Resources Board Rule of Procedure 36 is similar 'to one for summary judgment under the Vermont Rules of Civil Procedure. See Water Resources Board Rule of Procedure 36(D), 6 Code of Vermont Rules 12 004 001-32 (Feb. 2002) (stating that summary judgment is granted if "pleadings, admissions on file, and affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law"); V.R.C.P. 56(c)(3) (stating summary judgment standard); *In re Morehouse Brook, Englesby Brook, Centennial Brook, & Bartlett Brook*, Nos. WQ-02-04, WQ-02-05, WQ-02-06, WQ-02-07, at 2-3 (Dec. 19, 2002), available at http://www.nrb.state.vt.us/wrp/decisions/ wrbdecisions/2002/wq02-04mod.pdf. This Court reviews a grant of summary judgment de novo and will affirm if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Springfield Terminal Ry. v. Agency of Transp.*, 174 Vt. 341, 344,

816 A.2d 448, 452 (2002). We accord substantial deference to the Board's expertise in the area of water quality control. *In re Clyde River Hydroelectric Project*, 2006 VT 11, ¶ 10, 179 Vt. 606, 895 A.2d 736 (mem.). Thus, we review the Board's decision to determine "whether the Board acted arbitrarily, unreasonably, or contrary to law." *In re Lyon*, 2005 VT 63, ¶ 15, 178 Vt. 232, 882 A.2d 1143. Blending the standards together, we review the Board's grant of summary judgment de novo, but with deference to its expertise in the area of water quality control.

¶ 13. The Board decided this case on claim preclusion, ruling that "design capacity and other design features" that were approved in prior permits could not be relitigated in this amendment proceeding. It relied upon its holding in another proceeding that "a party may not litigate through a permit amendment proceeding a matter finally decided in a prior permit." *In re Town of Shoreham Wastewater Treatment Facility*, No. WQ-00-11, at 7 (May 2, 2001), available at http://www.nrb.state.vt.us/wrp/decisions/ wrbdecisions/2001/wq00-11-mod.pdf. That decision in turn relied upon our decision in *In re Taft Corners Assocs.*, 160 Vt. 583, 632 A.2d 649 (1993), in which we held that final permits cannot be collaterally attacked: "Because neither the 1987 ... permit nor the 1988 amendment was appealed to the Board, the findings, conclusions and permits are final and are not subject to attack in a subsequent application proceeding, whether or not they were properly granted in the first instance." *Id.* at 593, 632 A.2d at 654. Thus, the Board held that the question of whether UBC's sewage disposal system met regulatory standards was determined in the earlier permit amendment for a wastewater volume of 9,500 gallons per day, and could not be relitigated. We agree that the Board's conclusion is commanded by *In re Taft Corners*.

¶ 14. Appellants have two arguments against the application of claim preclusion in this case. Appellants' main argument is that the change from composting toilets to flush toilets, which changes the resulting wastewater from only gray water to gray water and black water, is a substantive change in wastewater quality so that a full review of the environmental impact would not represent a collateral attack on either of the earlier permits. The Board found that the extent to which the wastewater entering the sewage disposal system contains black water is not a valid basis for distinguishing the earlier permit.

¶ 15. In rejecting appellants' argument, the Board relied primarily on the definition of "sewage" in the Indirect Discharge Rules because each of the permits authorized applicant to treat and indirectly discharge "sewage." The definition of sewage is "waste containing human fecal coliform and other potential pathogenic organisms from sanitary waste and used water from any building, including but not limited to carriage water, shower and wash water, but does not include stormwater." Indirect Discharge Rules § 14-300(a)(32), 7 Code of Vermont Rules 12 033 003-16 (July 2003). The Board found that this definition includes both black and gray water. Thus, the first amended permit was not limited to the disposal of only gray water even though UBC intended to use it that way. Since the first amended permit authorized the use of the permitted system for disposal of black water up to the same volume limit, the Board found that relitigating the environmental impacts in this case would be a collateral attack on that permit.

¶ 16. The Board's reasoning is further supported by the fact that there is no mention of gray water or black water in any of the three permits issued to UBC. Moreover, the Treatment Index Method of demonstrating compliance with envi-ronmental standards is described in detail in the rules, and it is not dependent on the make-up of the sewage sent through the disposal system. See *id.* § 14-903, 7 Code of Vermont Rules at 12 033 003-52 to -56. Thus, ANR has found that a system that meets Treatment Index Method requirements is valid for any mix of gray and black water input.

¶ 17. We uphold the Board's construction of the indirect discharge regulations as consistent with their plain meaning, *In re 1650 Cases of Seized Liquor*, 168 Vt. 314, 319, 721 A.2d 100, 104 (1998), and within the Board's expertise, *In re Clyde River*, 2006 VT 11, ¶ 10. Accordingly, we affirm its decision that the change in the make-up of the waste flowing into the disposal system is not grounds for a full review of the new system.

¶ 18. Appellants' second reason that claim preclusion does not apply is that a specific rule requires a full new review of the system for the permit amendment sought. Again, appellants rely on the conversion from composting to flush toilets and the effect of this change on the waste entering the disposal system. For this argument, they rely upon the language of the Indirect Discharge Rules on permit amendments:

> Major revisions to existing permits shall be processed as permit amendments by the Secretary. Examples of when a permit amendment is required include an increase in discharge volume or *substantive change in the quality of the wastewater discharged*, a substantial change in the treatment system for the indirect discharge or other changes which, in the opinion of the Secretary, change the nature, capacity or potential impact of the system. The Secretary will advise the applicant of the information that must be

submitted for a complete application for permit amendment.

Indirect Discharge Rules § 14-407(a), 7 Code of Vermont Rules 12 033 003-32 (July 2003) (emphasis added). Appellants argue that the change from composting toilets to flush toilets constitutes a "change in the quality of the wastewater discharged" because of the change from all gray water to gray water and black water. They then argue that a "major revision" under § 14-407(a) requires a more searching review under § 14-402, as if the amendment were an application for new indirect discharge. They point out that ANR treated the second permit amendment as a major revision under § 14-407(a).

¶ 19. There are two flaws in appellants' argument. First, whatever the significance of the label "major revision," nothing in § 14-407(a) or other rules requires that a major revision be reviewed as a new indirect discharge. Instead, the language of § 14-407(a) states that when a permit amendment is considered a major revision, "[t]he Secretary will advise the applicant of the information that must be submitted." *Id.* The rule gives the Secretary broad discretion to determine what information is required to process the amendment, and does not mandate review as a new indirect discharge as appellants argue. Second, the Board's response to appellants' first argument for why claim preclusion does not apply is also relevant to appellants' second argument. The overall policy of the rules is that a change in the nature of the sewage entering the disposal system does not affect the discharge. Thus, there is no "substantive change in the quality of the wastewater discharged" as those words are used in § 14-407(a) of the rules.

¶ 20. The Board correctly ruled that there are no genuine issues of material fact bearing on whether claim preclusion prevents appellants from relitigating whether UBC's waste disposal system will have prohibited environmental impacts. We also affirm that claim preclusion applies. Since appellants rejected the limited review that was available for issues not precluded, the Board properly dismissed the appeal.

*Affirmed.*