Filed 01/27/26

VERMONT SUPERIOR COURT
32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT 05401
802-951-1740
www.vermontjudiciary.org



ENVIRONMENTAL DIVISION
Docket No. 25-ENV-00012

---

| NEWSVT Act 250 JO 7-413 | **DECISION ON MOTIONS** |
|---|---|

In this matter, New England Waste Services of Vermont, Inc. (NEWSVT) appeals jurisdictional opinion 7-413 (the JO) issued by the District #7 Environmental Commission Coordinator (District Coordinator) concluding that NEWSVT required an Act 250 permit amendment in the event that NEWSVT sought to convert a leachate pretreatment system from a pilot program to a permanent installation at NEWSVT's facility in Coventry, Vermont (the Property).

In a September 12, 2025 Entry Order, this Court converted NEWSVT's motion for judgment on the pleadings and a motion to dismiss Questions 1 and 2 filed by interested party Don't Undermine Memphremagog's Purity, Inc. (DUMP) to motions for summary judgment. See In re NEWSVT Act 250 JO 7-413, No. 25-ENV-00012 (Vt. Super. Ct. Envtl. Div. Sept. 12, 2025) (Walsh, J.). The Court directed the parties to file supplemental statements of undisputed material facts in support of these converted motions in October, with replies due in November. The parties submitted their desired filings and the Court subsequently took the matter under advisement.

As such, presently before the Court are cross-motions for summary judgment filed by NEWSVT, DUMP, and the Land Use Review Board (LURB). Also before the Court are DUMP and the LURB's motions to dismiss Questions 9 through 11 of NEWSVT's Statement of Questions.

### Factual Background

We recite the following facts solely for the purposes of deciding the pending cross-motions. These facts do not constitute factual findings because factual findings cannot occur until after the Court conducts trial. Fritzeen v. Trudell Consulting Eng'rs, Inc., 170 Vt. 632, 633 (2000) (mem.).

1. NEWSVT owns and operates a landfill facility in Coventry, Vermont.

2. That landfill facility is subject to Land Use Permit Series #7R0841.

3. NEWSVT has a Surface Active Foam Fractionation (SAFF) leachate pretreatment system at the Property that is subject to various approvals from the Agency of Natural Resources (ANR).

1

4. The intent of the system is to remove pre- and polyfluoroalkyl substances (PFAS) and treatment of other contaminants from leachate at the landfill. The system is managed by existing on-site infrastructure and treated leachate is disposed of off-site.

5. The SAFF leachate pretreatment system is operating on a pilot system basis but at some point may become a permanent installation at the Property.

6. On July 23, 2019, the District Commission issued LUP #7R0841-13, which authorized NEWSVT "to construct and operate Phase VI, to allow expansion and continued operation of the existing double-lined Landfill Facility, including expanded leachate management and gas control infrastructure . . . ." LURB Exhibit 2.

7. LUP #7R0841-13 includes Condition 6 which states: "Any nonmaterial changes to the permits listed in the preceding condition shall be automatically incorporated here upon issuance by the Agency of Natural Resources." Id.

8. LUP #7R0841-13 includes Condition 8 which states: "No change shall be made to the design, operation or use of this project without a permit amendment issued by the District Commission or a jurisdictional opinion from the District Coordinator that a permit is not required." Id. at 2.

9. LUP #7R0841-13 includes Condition 18(a) which states that NEWSVT may not dispose of leachate locally at the Property, at the Newport wastewater treatment facility (WWTF), or in the watershed of Lake Memphremagog without an Act 250 permit amendment. Id. at 4.

10. LUP #7R0841-13 includes Condition 18(c) which requires that: "Permittee shall apply for an Act 250 permit amendment for any change to its method of leachate management, pre-treatment, and disposal, including but not limited to construction of on-site treatment systems." Id.

11. Pretreatment Discharge Permit #3-1406, issued by ANR, became effective in January 2023. The permit authorized NEWSVT to truck leachate from the Property to the Montpelier WWTF and advance work (as set forth in a "Conceptual Leachate Treatment Scoping Study for . . . NEWSVT Landfill") by conducting a pilot study for technology used in treatment/pretreatment of leachate that would inform the design for a system for complete implementation. NEWSVT Ex. C.

12. As a part of this process, NEWSVT applied for and Act 250 permit amendment, ultimately issued as LUP #7R0841-17.

13. On June 30, 2023, LUP #7R0841-17 was issued, which authorizes "the construction of 60 feet by 60 feet building to house equipment for additional on-site pretreatment (e.g. pilot treatment testing) of landfill leachate. This permit does not modify the leachate collection system (pipes, storage

tanks, wastewater tanker loading systems) of the previously permitted double-lined Landfill Facility, as previously reviewed and approved via 7R0841-13." LURB Ex. 3 at 1.

14. Condition 5 of LUP #7R0841-17 mirrors Condition 6 of the #7R0841-13 permit, addressed in Paragraph 6.

15. Condition 8 of #7R0841-17 mirrors Condition 8 of the #7R0841-13 permit, addressed in Paragraph 7.

16. The pilot pretreatment system malfunctioned in February 2024 due to freezing temperatures and ice blockages, resulting in leachate spilling on-site. The spill was cleaned up and impacted soils were removed from the site.

17. On September 17, 2024, DUMP requested a jurisdictional opinion regarding NEWSVT's need for a permit amendment for the pretreatment system.

18. On January 21, 2025, the District #7 Coordinator issued the JO, concluding that a permit amendment was required to convert the pilot system to a permanent installation at the Property.

19. NEWSVT appealed that decision to this Court.

### Discussion

**I.      Questions 1 and 2: Standing**

Questions 1 and 2 ask:

> 1. Does DUMP have standing to seek a jurisdictional opinion about the leachate pretreatment system?
>
> 2. To the extent that DUMP has standing under Act 250, is 10 V.S.A. § 6007(c) unconstitutional because it allows a person to request judicial intervention without having the minimally necessary constitutional standing?

Statement of Questions (filed on Mar. 11, 2025).

The Court concludes that DUMP did not need to have standing to request the JO and, therefore, whether it did/does have standing when it requested the JO is not relevant.

Title 10, Section 6007(c) states that "any person" may request a jurisdictional opinion from a District Coordinator. 10 V.S.A. § 6007(c). This Court, and the Environmental Board before it, have recognized that the Legislature has created a different standard for requesting a jurisdictional opinion and appealing the resulting jurisdictional opinion to this Court. See In re Marcelino Waste Facility, No. 44-02-07 Vtec, slip op. at 2—3 (Vt. Envt. Ct. Nov. 6, 2007) (Durkin, J.) (citing Re: Alpine Pipeline Co., DRR #415, Memorandum of Decision at 7 (Vt. Envtl. Bd. Jan. 3, 2003)); see also In re Vt. Verde Antique Intern., Inc., 174 Vt. 208, 212 (2002) ("Read in context, this suggests that 'any person' refers

broadly to third parties exclusive of the coordinator, who is authorized to rule on such requests, but not to make them."). At the time of the request, case law indicates that the requestor need not have standing, as defined by Article III of the U.S. Constitution, or party status, as that term is defined by Chapter 115, to submit the request. Instead, the question of standing arises if/when that requestor seeks to appeal a jurisdictional opinion to this Court. See id. Thus, DUMP did not need standing at the time it requested the JO. Because "any person" can request a jurisdictional opinion, DUMP could permissibly do so in this case.[1]

NEWSVT, through Question 2, requests that this Court declare § 6007(c) unconstitutional because it allows "a person to request judicial intervention without having minimally necessary constitutional standing." Article III of the U.S. Constitution mandates that those seeking judicial review have the requisite standing to do so. See U.S. Const., Art. III; see also Spokeo Inc. v. Robins, 578 U.S. 330, 338 (2016).

A request for a jurisdictional opinion is not a request for judicial review. It is a request submitted to an administrative agency to review whether a land use has triggered some level of Act 250 jurisdiction. NEWSVT presents no legal argument as to how the principles of Article III standing can reach back to a period before judicial review was sought, and therefore, declare § 6007(c) unconstitutional. What's more, as discussed above, this Court and the Environmental Board have interpreted § 6007(c) to be consistent with Article III and require standing in order to seek appellate review.

For these reasons, the Court **GRANTS** DUMP's motion for summary judgment on Questions 1 and 2 and **DENIES** NEWSVT's motion on the same Questions. In so holding, the Court makes no conclusion as to DUMP's standing generally as it relates to this project or its ability to retain party status in any future permit proceeding because, based on the foregoing conclusions, to

---

[1] The Court has misgivings about this interpretation and past precedent regarding the "any person" language. We note that no case explicitly states that "any person" obviates the requirement that a requestor have an interest protected by Act 250. This is concerning to the Court. NEWSVT correctly addresses the practical concern with this interpretation. As presently interpreted, a person or entity, who could be from a different municipality, the other side of Vermont, or even a different state, could, for whatever reason, submit a request for a jurisdictional opinion to the District Coordinator without any interest protected by Act 250. The resulting jurisdictional opinion occurs without a hearing and without standard practices and is based on information provided from the requestor, though various District Coordinators may conduct varying levels of additional review. If the individual's request results in an opinion triggering jurisdiction and the landowner disagrees, the landowner is required to obtain judicial review in this Court. Thus, the landowner would be forced to expend time and resources while the status of compliance with Act 250 remained unclear. Put simply, this seems unfair. Further, requiring that requestors have party status or an interest protected by Act 250 would not limit or impede the LURB's ability to ensure landowners remain in compliance with Act 250 requirements. The LURB has multiple avenues to pursue enforcement actions to gain compliance with Act 250.

4

do so would be to provide an impermissible advisory opinion. Because DUMP's standing to request the JO is not relevant at the time of the request, there are no grounds to void the JO due to insufficient Article III standing.

## II.     Questions 3 through 8: Permit Amendment

Questions 3 through 8 all functionally ask, with varying levels of specificity, whether a permit amendment is required to move the leachate pretreatment system from pilot stage to a permanent installation.

### a.  Jurisdiction

Once Act 250 jurisdiction has attached, a permit amendment is required for a material change to an existing development or subdivision.  Act 250 Rules, Rule 34(A).  A "material change" is one that results in:

> [A]ny cognizable change to a development or subdivision subject to a permit under Act 250 or findings and conclusions under 10 V.S.A. § 6086b, which has a significant impact on any finding, conclusion, term or condition of the project's permit or which may result in a significant adverse impact with respect to any of the criteria specified in 10 V.S.A. § 6086(a)(1) through (a)(10).

Act 250 Rules, Rule 2(C)(6).[2]

The "material change" analysis poses a two-part inquiry.  In re Request for Jurisdictional Opinion re Changes in Physical Structures & Use at Burlington Int'l Airport For F-35A, 2015 VT 41, ¶ 21.  First, there must be a cognizable physical change or change in use.[3]  Id. at ¶ 25.  In this part of the analysis, the Court "considers whether the change is a departure from what was contemplated in the development's original permit."  In re Comtuck, LLC E. Tract Act 250 Jurisdictional Opinion Appeal, No. 54-5-17 Vtec, slip op. at 11 (Vt. Super. Ct. Envtl. Div. Mar. 29, 2010) (Durkin, J.) (citation omitted).  If there has been such a cognizable change, the Court moves to the second part of the

---

[2] Through Question 6, NEWSVT asks whether a permit amendment is required because it alleges the change from pilot to permanent will not have "a significant impact on any findings, conclusion, term or condition" of it's prior Act 250 permits.  This Question cuts the material change analysis short.  As cited in Rule 2(C)(6), a material change may occur when a change may have such an impact on a prior permit or when the change "may result in a significant adverse impact with respect to any of the Act 250 criteria.  Act 250 Rules, Rule 2(C)(6).  The Court looks to the totality of the material change analysis when analyzing Questions 3 through 8.

[3] The "material change" analysis explicitly contemplates changes in use of a property as potentially triggering the need for a permit amendment.  Thus, NEWSVT's assertion that "development," as that term is defined by 10 V.S.A. § 6001, is the triggering event for a permit amendment is irrelevant.  The analysis is the "material change" analysis, which contemplates use-based cognizable changes.  While activities that may constitute "development" may also trigger the need for an Act 250 permit amendment, "development" alone is not the standard.

analysis and determines whether the change has "the potential for significant impact under any of the Act 250 criteria." Id. (citation omitted).

With respect to the first prong, we find that the conversion of a pilot program to a permanent installation constitutes a cognizable change in use.

An aspect of the Court's analysis here is whether the change is a "departure from what was contemplated" in the prior permit. Comtuck, No. 54-5-17 Vtec, slip op. at 11 (Mar. 29, 2019). "Even a modest change may be considered a cognizable change." In re N. E. Mat. Grp. LLC Act 250 JO I, 2015 VT 79, ¶ 31 (citing In re Vt. RSA Ltd. P'ship, 2007 VT 23, ¶ 11). "A thing is cognizable as long as it is '[c]apable of being known or recognized.'" In re N. E. Mat. Grp. LLC Act 250 JO, 2016 VT 87, ¶ 4 (quoting Black's Law Dictionary 316 (10th ed. 2014). Thus, "a change should be considered cognizable as long as it is notably distinct from whatever preceded it." Id.

LUP #7R0841-17 contemplated the construction of a building. That building was to house a leachate pretreatment system that would be operating on a pilot basis and, generally, the system's pilot status was generally acknowledged at the time of permitting. This permit does not address the pretreatment system's status as a permanent installation. While it is true that the #7R0841-17 permit contemplates the treatment system's installation, it does not contemplate its operation as a permanent aspect of NEWSVT's operations. While it may follow logically that a pilot system might one day become permanent, that does not mean approval of the permit licensing construction of a building to house the pilot system implicitly includes approval for the transition to a permanent system. A review of the permit makes that apparent. Thus, we conclude the first prong has been met because the permanent system is notably distinct from what was previously permitted—the construction of a building designed exclusively to house a pilot system.

Next, we determine whether the change has "the potential for significant impact under any of the Act 250 criteria." Comtuck, No. 54-5-17 Vtec, slip op. at 11 (Mar. 29, 2019). (citation omitted). We conclude that it does. When considering a spill that happened on-site in 2024, there is a potential for a significant impact under Criterion 1 and 1(B). See RE: C.V. Landfill & John F. Chapple, No. 5W1150-WFP, Findings of Fact, Conclusions of Law, and Order, slip op. at 19 (Vt. Envt. Bd. Oct. 15, 1996) (recognizing that operation of a leachate system resulting in uncontrolled discharges had the potential for and resulted in in significant impacts under Criteria 1 and 1(B)). Further, the leachate pretreatment system contemplates transporting leachate from the Property to the Montpelier WWTF. Due to an increase in traffic and related impacts, transport from Coventry to Montpelier creates the potential for significant traffic impacts under Criterion 5 and 9(K) not previously considered by the

District Commission. Having concluded that the conversion has at least the potential for a significant impact under Criteria 1, 1(B), 5, and 9(K), the Court concludes that the second prong is satisfied.[4]

Thus, we conclude that that converting the pilot treatment system to a permanent installation is a material change requiring an Act 250 permit amendment.

*b. Preemption*

Having concluded the presence of a material change triggers Act 250 jurisdiction, we now address NEWSVT's assertion that jurisdiction is preempted by federal law. Specifically, NEWSVT argues that, even if the transition from pilot to permanent requires a permit amendment, jurisdiction over the pretreatment system is preempted by federal law. As a threshold matter, DUMP and the LURB argue that NEWSVT is precluded from raising this assertion either because the issue is not directly raised in its Statement of Questions or under the theory of collateral estoppel. We address both of these arguments first.

This is a court of limited jurisdiction. In re DJK, LLC WW & WS Permit, 2024 VT 34, ¶ 25; 4 V.S.A. § 34 (identifying Environmental Division's jurisdiction). Our review is further limited to those issues identified through an appellant's Statement of Questions, here NEWSVT. See V.R.E.C.P. 5(f); see also 10 V.S.A. § 8504(h) (directing that, with respect to de novo hearings, legal issues to be addressed on appeal be limited to "those issues which have been appealed"). A Statement of Questions "functions like a pleading to limit the issues that are to be heard on the appeal." Atwood Planned Unit Dev., 2017 VT 16, ¶ 12 (quotation omitted). An "appellant may not raise any question outside of the statement . . . ." Id. (quotation omitted). Despite this, the Court can consider matters "intrinsic to a statement of questions" even if "the issue was not literally stated in the statement of questions," Id. at ¶ 17.

NEWSVT's Questions 3 and 4 are broad enough to intrinsically reach NEWSVT's assertion that preemption renders a permit amendment unnecessary. Question 3 generally asks whether an Act 250 permit amendment is required, and Question 4 asks more specifically whether a permit amendment is required when the pilot system becomes a permanent installation. NEWSVT's argument that no permit amendment is required due to federal preemption is functionally an affirmative defense to the assertion that an amendment is required. Thus, we conclude that

---

[4] NEWSVT functionally argues the merits of the project's compliance with various Criteria, largely focused on Criterion 1. The analysis at this point is not whether the project ultimately complies with Act 250's criteria, but whether a permit amendment must be sought to make a determination on that issue in the first instance. Nothing in this decision eliminates NEWSVT's ability to argue that the system and its overall operations do not result in an undue adverse impact on any applicable criteria.

NEWSVT's federal preemption argument is intrinsic to Questions 3 and 4, and therefore, properly before the Court.[5]

Next, DUMP and the LURB argue that NEWSVT is precluded from raising this argument under the doctrine of collateral estoppel. Issue preclusion or collateral estoppel is appropriate when: "(1) preclusion is asserted against one who was a party in the prior action; (2) the same issue was raised in the prior action; (3) the issue was resolved by a final judgment on the merits; (4) there was a full and fair opportunity to litigate the issue in the prior action; and (5) applying preclusion is fair." Trickett v. Ochs, 2003 VT 91, ¶ 10, 17 Vt. 89.

Functionally, the LURB argues that because Act 250 jurisdiction attached to the Property in 1991 and NEWSVT generally did not raise the pending federal preemption argument prior to this action, it is precluded from raising the argument in this action. This is not the preclusion standard. While the federal preemption argument may have been appropriately raised at some point in NEWSVT's Act 250 permitting history, no party points to any prior action wherein this issue was raised or resolved by final judgment on the merits. Thus, issue preclusion does not apply. We therefore reach the merits of NEWSVT's preemption argument.

"Federal preemption of state and local law can be express, or implied through either field or conflict preemption." F-35A, 2015 VT 41, ¶ 27 (citation omitted). NEWSVT asserts that the Clean Air Act (CAA) and Clean Water Act (CWA) preempt all jurisdiction in this case under a theory of conflict preemption. Conflict preemption occurs when state law actually conflicts with federal law. See In re Stokes Comm'ns Corp., 164 Vt. 30, 38 (1995) (citing English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990)). "We will find preemption where it is impossible for a private party to comply with both state and federal law . . . and where under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372–73 (2000) (internal quotations and citations omitted). In Crosby, the U.S. Supreme Court recognized that what constitutes an "obstacle is a matter of judgment." Id. at 373. It recognized that prior case law considered "[i]f the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law my yield to the regulation of Congress within the sphere of its delegated power." Id. (quoting Savage v. Jones, 225 U.S. 501, 533 (1912).

[5] Because we conclude that this argument is intrinsic to the Statement of Questions, NEWSVT's motion to amend its Statement of Questions to explicitly include this argument is **MOOT**.

Importantly, "there is no actual conflict where a collision between two regulatory schemes is not inevitable." Stokes Comm'n, 164 Vt. at 38 (citing Fl. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 143 (1963); English, 496 U.S. at 90). "There is a presumption that the power of the state has not been superseded by a federal act, and the party seeking to overcome this presumption bears a heavy burden." In re Investigation over Regulation of Voice Over Internet Protocol Servs., 2013 VT 23, ¶ 14 (internal citation and quotation omitted).

To the extent that NEWSVT argues that there have been delays in installing or finalizing all permitting decisions due to DUMP's alleged attempts to use Act 250 as a "super appeals court," NEWSVT provides no law to support the assertion that a third party's push for a state agency to mandate their project comply with additional state permitting regimes renders some or all of those permit regimes preempted by federal law. Functionally, it asserts that these attempts amount to an obstacle to comply with federal law. Nothing about this assertion demonstrates the type of impossibility contemplated by the U.S. Supreme Court when deciding conflict preemption cases. Further, for the reasons set forth below, this assertion cannot amount to an obstacle that results in failure to satisfy the purposes of the CWA or CAA or those laws being prevented from working as intended. Further, to the extent that they assert that interrelated permits are essentially inherently preempted, for the reasons set forth below, the potential additional permit may not even represent an obstacle to compliance with federal law as contemplated by Crosby. The Court will not so interpret it in this case. The mere fact that the potential need for additional permits creates "uncertainty and delay" in the project timeline from the Applicant's perspective does not truly reflect the sense in which "conflict" is meant here. Put another way, an applicant's discontent with the fact that there are or may be multiple permits required for a project, in and of itself, cannot support a finding of preemption.

To the extent that NEWSVT asserts that regulation resulting from an Act 250 permit amendment will conflict with its ANR permits and decisions, NEWSVT's argument in this regard is wholly speculative. NEWVT asserts that an attempt by the District Commission to regulate air and water pollution would interfere and conflict with the CAA and CWA, and various ANR permitting/regulatory schemes addressing related issues.[6] While it is true that Act 250 criteria also concern water and air pollution, the conclusion that any Act 250 regulation of those issues in this case will conflict with these permits and regulations is premature.

---

[6] The Court notes that DUMP and the LURB cite to cases at various points in their briefing that generally stand for the principal of Act 250's superiority to other environmental permitting matters in Vermont. None of these cases, however, address the issue of federal preemption.

Various permits issued by ANR create presumptions of compliance with the applicable Act 250 criteria as set forth in Act 250 Rules, Rule 19. See Act 250 Rules, Rule 19. An applicant may provide those permits in support of an application or state an intent to use as-yet received permits to raise these presumptions, at which point the District Commission may decide to defer issuing a permit until those unobtained permits are submitted. Id. at 19(B), (C). The submitted and recognized permits "create a rebuttable presumption that the portion of the development . . . subject to the permit, approval or certification is not detrimental to the public health and welfare with respect to the criteria specified" in Rule 19. Id. at 19(F). The resulting presumption "is merely 'locative,' placing the burden of going forward with evidence on the party against whom it operates as a rule of law, but operating without any independent probative value." In re Hawk Mountain Corp., 149 Vt. 179, 186 (1988) (citation omitted). Rebutting the presumption requires that "credible evidence is introduced fairly and reasonably indicating that the real fact is not as presumed." Id. (citation omitted). When a permit, approval or certification is issued by ANR, ANR's "technical determinations . . . shall be accorded substantial deference by the District Commission." Act 250 Rules, Rule 19(F)(1) (emphasis added).

As such, it would be speculative for the Court to conclude that any decision by the District Commission will in fact conflict with NEWSVT's existing ANR permits. That is because those permits may be used, in various capacities, as presumptions of compliance with various Act 250 criteria that interrelate to the permits' subject matter. While the presumption is rebuttable, it would be speculative to conclude that it would be rebutted or that the District Commission would stray from the terms of the permit in the Act 250 context in a way that would create a conflict. Again, put another way, it is very possible that the existing permits could be accepted as a presumption of compliance and, even if that presumption were rebutted, that the Act 250 decision would not conflict with the permits.

Thus, we conclude that jurisdiction is not preempted through the CWA and/or CAA under the theory of conflict preemption.

c. *Collateral Attack*

In addition to the preemption argument, NEWSVT argues that this jurisdictional opinion represents a collateral attack on final permits issued by ANR as a defense to Act 250 jurisdiction attaching. As with conflict preemption, the Court concludes this assertion is speculative at this time. Similar to the above, this is because the issue before the Court is whether a permit amendment must be sought, not the merits of any application. In arguing against this assertion, however, the LURB asserts that 24 V.S.A. § 4472 is "has no effect" on the LURB's regulation of Act 250 and asserts that

conclusion is in based in part upon Act 250's primacy over other permit approval processes. See OMYA, Inc. v. Town of Middlebury, 171 Vt. 532, 532–33 (2000) (citing In re Agency of Transp. 157 Vt. 203, 208–09 (1991)). The Court is surprised by this assertion. Although the general provision setting forth the bar on collateral attacks is found within Chapter 117, it has been applied to Act 250 permits for more than 30 years, as well as to ANR permits. See In re Taft Corners Assocs., Inc., 160 Vt. 583, 593 (1993); In re Unified Buddhist Church, Inc., 2006 VT 50, ¶ 13, 180 Vt. 515 (mem). Thus, while the assertion is premature in this jurisdictional opinion context, and the Court need not rule upon how the bar on collateral attacks interacts with the theories cited by the LURB at this time, it is clear that the bar on collateral attacks is relevant in the Act 250 context.

III. **Question 9[7]: Primary Jurisdiction**

Question 9 asks: "Does the doctrine of primary jurisdiction bar the Act 250 commission from acting on these issues?"

The doctrine of primary jurisdiction allows courts to "refrain from exercising jurisdiction when an alternative tribunal with expertise in the subject matter is available to decide the dispute." C.V. Landfill, Inc. v. Envt'l Bd., 158 Vt. 38, 388–89 (1992) (citation omitted). The doctrine "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body[]. U.S. v. W. Pac. R. Co., 352 U.S. 59, 64 (1956) (emphasis added).

This Question asks the Court to impose the doctrine of primary jurisdiction onto the LURB and the relevant District Commission because NEWSVT asserts that other laws that interrelate to various Act 250 criteria vest regulatory jurisdiction wholly in ANR. As noted above, the doctrine of primary jurisdiction applies to claims that are "originally cognizable in the courts." W. Pac. R. Co., 352 U.S. at 64 (emphasis added). The Act 250 permitting process and appeals of decisions thereof is not a claim that is originally cognizable in this Court. It begins with review of an application by the relevant District Commission.[8] Thus, the doctrine of primary jurisdiction is irrelevant in this context.

---

[7] DUMP and the LURB have moved to dismiss Questions 9, 10 and 11. DUMP moves pursuant to V.R.C.P. 12(b)(6). The LURB's motion is made pursuant to both V.R.C.P. 12(b)(1) and 12(b)(6).

[8] The interrelated nature of this process with other permitting regimes is discussed when analyzing NEWSVT's preemption argument. To the extent that any aspect of the doctrine of primary jurisdiction would be relevant in this context, for the same reasons as set forth with respect to NEWSVT's preemption argument, NEWSVT's argument in this regard must fail.

11

Further, there are three factors for a court to consider when determining whether to apply the doctrine of primary jurisdiction. They are: "(1) whether the question to be decided is one of law or is a mixed question of fact and law; (2) whether an alternative tribunal with expertise is available to adjudicate the controversy; and (3) whether the plaintiff is attacking the validity of the statute." Smith v. Desautels, 2008 VT 17, ¶ 11 (quotation omitted). Before the Court is an appeal of the JO, issued pursuant to Chapter 151 of Title 10. There is no alternative tribunal other than the District Coordinator, and this Court on appeal, to adjudicate the merits of whether NEWSVT requires an Act 250 permit amendment. While various Act 250 criteria may interrelate to matters over which ANR also has authority, or the agency may have authority through other permitting schemes, ANR has no authority to adjudicate whether NEWSVT needs an Act 250 permit amendment. That a permit amendment decision may intersect with other permitting regimes where ANR retains authority does not alter this conclusion.

For this reason, the LURB and DUMP's motion to dismiss is **GRANTED** as the Question fails to state a claim upon which relief can be granted. NEWSVT's motion for summary judgment on this Question is **DENIED** and we conclude in review of Question 9 that the doctrine of primary jurisdiction does not bar the Act 250 commission from acting on these issues.

IV. **Question 10: Advisory Opinion**

Question 10 asks: "Is the request for a jurisdictional opinion premature when other administrative agencies have not finalized the design of the Leachate Pretreatment System, and thus, is an advisory opinion?" Statement of Questions (filed Mar. 11, 2025). This Question poses one of this Court's jurisdiction and is therefore a legal dispute. There are no material facts in dispute related to this legal issue.

This Court has long recognized that a jurisdictional opinion is effectively "a statutory authorization for a district coordinator, and this Court on appeal, to render an advisory opinion as to whether a proposed development requires a state land use permit." In re WhistlePig, LLC Act 250 JO, No. 21-2-13 Vtec, slip op. at 11 (Vt. Super. Ct. Envtl. Div. Apr. 11, 2014) (Durkin, J.) (citing 10 V.S.A. § 6007(c)). We have recognized that jurisdictional opinions are of "limited value since [they] govern[] only the development as represented by the party requesting the opinion." Id. For that reason and because they are conducted without an evidentiary hearing, jurisdictional opinion "are, by their nature, based on hypotheticals, and are 'only as good as the facts upon which [they are] based.'" Id. (citing In re Lake Champlain Bluegrass Festival, No. 204-11-10 Vtec, slip op. at 11 (Vt. Super. Ct. Envtl. Div. Jan. 3, 2012)).

12

Thus, it has been established that jurisdictional opinions qualify as acceptable forms of advisory opinions that this Court has jurisdiction to issue on appeal. As the LURB recognizes, the JO presently on appeal relates to the conversion of the Leachate Pretreatment System from a pilot program to a permanent installation and the potential impacts under relevant Act 250 criteria. Should additionally permitting and design changes to that system result in the elimination of impacts presently contemplated by this appeal, NEWSVT is free to pursue a JO concluding that this redesigned system does not trigger the need for an Act 250 permit amendment. That this may occur at some point in the future, however, does not render this appeal or JO, generally, an advisory opinion.

Thus, this Question must be answered in the negative. NEWSVT's motion on Question 11 is **DENIED**. Because this Question may be answered in the negative as a matter of law, it presents an issue upon which no relief can be granted to NEWSVT. Thus, DUMP and the LURB's motion to dismiss on this issue is **GRANTED** and Question 11 is DISMISSED.

## V. **Question 11: State Policy on PFAS Regulation**

Question 11 asks: "Does the need to develop technology to treat PFAS in landfill leachate necessitate a more flexible approach to administrative law in Vermont?" Statement of Questions (filed Mar. 11, 2025).

This Question presents an issue that is outside the scope of this Court's jurisdiction. This Cour hears this appeal de novo. 10 V.S.A. § 8504(h); V.R.E.C.P. 5(g). "The substantive scope of this appeal is limited to what was before the District Coordinator; the Court does not have authority to hear issues that were not before the District Coordinator or issues that are broader that those that were before the District Coordinator." In re Baldwin Prop. Act 250 Jurisdictional Opinion #4-220, No. 255-12-09 Vtec, slip op. at 14–15 (Vt. Super. Ct. Envtl. Div. May 6, 2010) (Wright, J.) (citing Appeal of Yates, No. 158-9-04 Vtec, slip op. at 6 (Vt. Envtl. Ct. Apr. 17, 2007) (Durkin, J.); In re Kibbe Zoning Permit, No. 173-8-07 Vtec, slip op. at 7 (Vt. Envtl. Ct. Feb. 13, 2008) Wright, J.).

This Question asks whether the State of Vermont, as a whole, should adopt a general policy of flexibility in various aspects of administrative law as it relates to PFAS in landfill leachate. While the complex nature of state regulation of PFAS at NEWSVT's facility is apparent from the multiple dockets that have come before the Court in the past few years related to this issue, the Court is without the authority or jurisdiction in this case to issue an advisory opinion as to how Vermont's administrative agencies should view regulating such issues. See In re Snowstone, LLC Stormwater Discharge Authorization, 2021 VT 36, ¶ 28, 214 Vt. 587 ("Courts are not authorized to issue advisory opinions because they exceed the constitutional mandate to decide only actual cases and

controversies."); see also <u>Baker v. Town of Goshen</u>, 169 Vt. 145, 151–52 (1999) (noting that the issues presented on appeal "must be a necessary part of the final disposition of the case to which it pertains.") (citation omitted).

For these reasons, NEWSVT's motion is **DENIED** on Question 11. DUMP and the LURB's motion to dismiss is **GRANTED**. Question 11 is **DISMISSED**.

**Conclusion**

For the foregoing reasons, the Court concludes that DUMP did not require standing when it requested the JO such that its standing does not present grounds to void the JO. Further, the Court concludes NEWSVT requires an Act 250 permit amendment to convert the pilot pretreatment system to a permanent installation. Federal law does not preempt this conclusion and any conflict between federal and state law is speculative. Finally, we conclude that the doctrine of primary jurisdiction is not applicable to these circumstances, that the JO is not an impermissible advisory opinion, and that the Court is without jurisdiction to issue a decision on Question 11 as it relates to general state policy concerning PFAS regulation.

We therefore **DENY** NEWSVT's motion for summary judgment. We **GRANT** DUMP's motion for summary judgment on Questions 1 through 8. We **GRANT** DUMP and the LURB's motions to dismiss Questions 9 through 11.

This concludes the matter before the Court. A Judgment Order accompanies this Decision.

Electronically signed this January 27, 2026 pursuant to V.R.E.F. 9(D).

Thomas G. Walsh, Judge
Superior Court, Environmental Division